FILED
2017 Sep-08  AM 11:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CHARLES H. MEANS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **CASE NO.:**_____ |
| **HARTFORD LIFE AND** | ) |
| **ACCIDENT INSURANCE** | ) |
| **COMPANY** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

Comes now the Plaintiff, Charles H. Means, and hereby files his Complaint against Hartford Life and Accident Insurance Company.

## PARTIES

1.  The Plaintiff, Charles Means ("Means"), is an insured under Long Term Disability policy No. GLT-395120 ("the Plan"), who has been improperly denied benefits under the Plan.

2.  Defendant, Hartford Life and Accident Insurance Company, is the Claims Administrator for the Plan issued to Children's of Alabama – CHA Trust, that has improperly denied benefits owed to Mr. Means. Upon information and belief, Hartford is a foreign corporation incorporated in the State of Connecticut, which

conducts business generally in the State of Alabama and specifically within this District.

## JURISDICTION AND VENUE

3.   This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.   Plaintiff asserts claims for long-term disability benefits, enforcement of ERISA rights and statutory violates of ERISA under 29 U.S.C. §1132.   This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.   29 U.S.C. §1132(a),(e)(1) and (f) and 28 U.S.C. §1131.   Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## INTRODUCTION

4.   The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans."   *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983).   Mr. Means, as an employee insured for disability, was supposed to be treated as a beneficiary by the Defendant as statutory fiduciary.   Instead, the Defendant has victimized Mr. Means by engaging in utterly reprehensible claim handling procedures.   The shortcomings of ERISA as it relates to claims for "welfare" benefits have been exploited by the Defendant to avoid paying Mr. Mean's valid claim that would otherwise be payable under state insurance law. With no jury trial and no punitive damages, despite the

unscrupulous conduct of the Defendant, Mr. Means requests payment of his wrongfully terminated benefits plus interest and attorney's fees, as well as any and all equitable relief and damages he may be entitled to.

## STATEMENT OF FACTS

5.   Mr. Means is an insured under the Hartford Life and Accident Insurance Co. Policy No. GLT-395120, issued to his employer, Children's of Alabama – CHA Trust. The Hartford is the administrator of the plan. The policy provides insureds, like Mr. Means, long-term disability benefits. (*See* Exhibit "A" The Hartford LTD Policy).

6.   Mr. Means was born on August 1, 1959.  Mr. Means worked at Children's of Alabama as a Food Services Supervisor for 37 years until his disabilities forced him to stop working on October 20, 2014.

7.   Mr. Means' medical disabilities include Rheumatoid Arthritis, Hypertension, chronic hip pain, neuropathy, and osteoarthritis in the knee. Mr. Means also suffers from the side effects of his necessary medications. All of these conditions and symptoms render Mr. Means unable to work.

8.   Mr. Means has long struggled with chronic pain stemming in part from arthritis in his knee. On October 13, 2014 Mr. Means presented himself to his long time physician Dr. Earl Salser, complaining primarily of pain in his right knee. The clinic notes from the visit show Mr. Means was suffering from joint pain, stiffness,

3

and swelling. Dr. Salser indicated Mr. Means had been diagnosed with arthritis, hypertension, neuropathy, and a MRSA infection. Dr. Salser also stated that the course of Mr. Means' pain was worsening. (*See* Exhibit "B", Dr. Salser notes dated October 13, 2014).

9.  On October 31, 2014 Mr. Means went to Dr. Karen Cardwell because of his ongoing knee pain. She diagnosed him with Osteoarthritis in his right knee. (*See* Exhibit "C", Dr. Cardwell Clinic Notes dated October 31, 2014).

10. On December 8, 2014 Mr. Means returned to UAB and saw Dr. Sameera Davuluri, who wrote that he presented with a new symptom. The clinic notes show that Mr. Means had wrist pain and elbow pain, that his current medications were not working, and that he was very unhappy with the overall pain control. (*See* Exhibit "D", Dr. Davuluri Clinic Notes dated December 8, 2014).

11.  In a "return to work" status request dated December 30, 2014, Dr. Cardwell requested that Mr. Means have his time off extended since he "cannot work at this time." (*See* Exhibit "E", Dr. Cardwell Return to Work status form dated December 30, 2014)

12.  With his disability persisting, Mr. Means applied for LTD benefits on January 15, 2015. The Hartford informed Mr. Means that he had been approved for LTD benefits on March 6, 2015.  (*See* Exhibit "F", Application for LTD Benefits and Hartford letter dated March 6, 2015).

13.   Mr. Means returned to Dr. Salser's office on January 14, 2015 due to his symptoms worsening, as well as a painful callus on the bottom of his right foot. On February 5, Dr. Salser continued to make note of Mr. Means' deteriorating condition, and stated that prolonged sitting exasperated the discomfort. Dr. Salser also decided to give Mr. Means a Handicap Placard form to fill out for his car. (*See* Exhibit "G", Clinic Notes dated January 14, 2015 and February 5, 2015).

14.   On January 23, 2015, Dr. Manish Patel and Dr. Mark Langston conducted a knee and pelvis routine on Mr. Means. Dr. Langston found "degenerative narrowing" as well as joint effusion. Dr. Patel reiterated Dr. Langston's findings, and also added that Mr. Means had "degenerative arthrosis" in the left knee. Dr. Patel reviewed Mr. Means' pelvis routine and found more degenerative arthrosis, this time in both hips. Dr. Patel noted that "there is also degenerative changes within the lumbar spine and SI joints." (*See* Exhibit "H", Reports of Exam dated January 23, 2015 and October 31, 2014).

15.   The Hartford asked Dr. Salser to fill out an "Attending Physician's Statement of Continued Functionality" on May 11, 2015. Dr. Salser noted swelling, and reported on Mr. Means' physical restrictions and limitations. Mr. Means was found to be able to walk or stand for only 30 minutes at a time, and only for a total of one hour per day. Dr. Salser wrote that Mr. Means could never bend at the waist, kneel, crouch, or carry more than 21 pounds, and could only

occasionally lift less than that. In clinic notes from the same day Dr. Salser wrote that Mr. Means' bilateral knee pain and swelling was worse with sitting, and that he was unable to stand for more than 15-20 minutes. He noted Mr. Means suffered from chronic hip pain, and that he currently had joint pain and swelling. Dr. Salser stated his impression to be that the course was worsening for Mr. Means. (*See* Exhibit "I", Attending Physician Statement dated May 11, 2015).

16.  On December 19, 2016, Mr. Means was informed by The Hartford that he will no longer "meet the Policy definition of Disability on and beyond January 11, 2017" and that he will no longer receive LTD benefits. In their denial letter, the Hartford referenced only two medical reports from Dr. Salser as supportive of their decision, neither of which were included in Mr. Means' case file. The reason for the termination was The Hartford's belief that Mr. Means was able to work. The Hartford clearly did not consider all of the medical evidence available to it when it made its erroneous decision to terminate Mr. Means' benefits, especially the clear documentation of Mr. Means' conditions worsening over time. (*See* Exhibit "J" Hartford Denial Letter dated December 19, 2016.)

17.  The Hartford conducted an "Employability Analysis Report" for Mr. Means on December 13, 2016. The sole medical evidence referenced in this report was the two medical reports from Dr. Salser that are missing from the claim file. The report noted that Mr. Means would be capable of working as a "server," an

absurd notion considering the fact that Mr. Means was found to be able to stand at most one hour a day, and continually suffered from wrist pain. The report also suggested that Mr. Means could work at an animal shelter, surprising considering the fact that he is unable to ever bend at the waist, or walk for more than 30 minutes at a time. (*See* Exhibit "K", Employability Analysis Report dated December 13, 2016).

18.  Mr. Means appealed the wrongful termination of his benefits on January 3, 2017. The next day, Dr. Curtis wrote a letter in support of Mr. Means which stated that "Mr. Means' conditions are chronic and lifelong in nature. The totality of his medical conditions has led to his inability to work a regular job." Dr. Curtis then requested that Mr. Means be allowed to maintain his disability coverage for his "chronic, ongoing health issues." That same day, Dr. Salser wrote a letter requesting that Mr. Means' disability coverage be continued. Dr. Salser stated that the primary conditions preventing Mr. Means from returning to work were a "recent DVT and lung clot (pulmonary thromboembolism) in June 2015 and ongoing and worsening rheumatoid arthritis." Dr. Salser also wrote that Mr. Means struggled to stand due to his right leg swelling from the DVT, and that "his gripping, holding, lifting is limited by his hand arthritis (from the rheumatoid arthritis). (*See* Exhibit "L", Plaintiff's appeal letter dated January 3, 2017, letters from Dr. Curtis and Dr. Salser dated January 4, 2017).

19.    The Hartford's "comprehensive review" of Mr. Means' appeal concluded about a month later, and he was informed that his appeal was denied on February 13, 2017. In its denial letter, the Hartford noted that it had received the letters from Mr. Means' treating physicians, but then proceeded to utterly ignore them. Other than acknowledging their existence, The Hartford made no attempt to address the concerns of Mr. Means' actual physicians. Instead, The Hartford decided to exclusively rely on the findings of its paid reviewer, Dr. Molinda, who at no point ever actually examined Mr. Means. This type of cursory review process is especially egregious considering the fact that Mr. Means was supposed to be treated as a beneficiary by The Hartford as statutory fiduciary. Directly contradicting the findings and statements of Mr. Means' treating physicians, Dr. Molinda concluded, without ever meeting him, that Mr. Means "can work full-time for 40 hours a week" and that Mr. Means had no functional restrictions. (*See* Exhibit "M" Hartford Appeal Denial Letter dated February 13, 2017).

20.   As of this date, Mr. Means has not received benefits rightfully owed to him under the Plan since The Hartford's wrongful termination of his benefits. The Hartford's decision to terminate benefits under Mr. Means' long-term disability policy was grossly wrong, without basis, in violation of ERISA regulations and contrary to the evidence.

21.   Mr. Means has met and continues to meet the Plan's definition of "Disabled".

22.   Defendant did not establish and maintain a reasonable claim procedure or provide a full and fair review of Mr. Means' claim as required by ERISA. Instead, Defendant acted only in its own pecuniary interests and violated ERISA by conduct including, but not limited to, the following: reviewing the claim in a manner calculated to reach the desired result of denying benefits; failing to properly consider and credit the medical opinions of Mr. Means' medical providers; and failing to have Mr. Means submit to independent medical exams.

23.   Upon information and belief, The Hartford evaluated and paid all claims under the Plan at issue, creating an inherent conflict of interest.

24.   Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to The Hartford or to any other entity who may have adjudicated Mr. Means' claim. Therefore, the Court should review the Plaintiff's claim for benefits under a *de novo* standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

25.   Mr. Means has exhausted any applicable administrative review procedures for his LTD claim, and The Hartford's refusal to pay benefits is both erroneous and unreasonable and has caused tremendous financial hardship for the Plaintiff.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

**A.   Defendant's Determination that Plaintiff does not Meet the Definition of Disability as Stated in the Plan was both Erroneous and Unreasonable.**

26.  The Long Term Disability Plan at issue states, in part:

Disability or Disabled means You are prevented from performing one or more of the Essential Duties of:

1.  Your Occupation during the elimination period
2.  Your Occupation, for the 24 months following the elimination period, and as a result Your Current Monthly Earnings are less than 80% of your Indexed Pre-disability Earnings; and
3.  After that, Any Occupation.
    **Any Occupation** means any occupation for which You are qualified by education training or experience, and that has an earnings potential greater than the lesser of:
1.  The product of Your Indexed Pre-disability Earnings and the Benefit percentage; or
2.  The Maximum Monthly Benefit

(*See* Exhibit "N", excerpt from Plaintiff's Long Term Disability plan).

27.  The LTD policy at issue defines disability as the inability to perform the *essential* duties of any occupation for which the insured is qualified based on education, training or experience. All of the available evidence clearly shows that Mr. Means would not physically be able to perform at even a sedentary exertional level. The Social Security Administration defines sedentary work as "involving lifting no more than 10 pounds at a time." The SSA notes that "although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties…periods of standing or walking should generally total no more than

10

about 2 hours of an 8 hour work day." Mr. Means' medical record shows that he is unable to walk or stand for more than an hour a day, and only in 30 minute intervals, which is clearly below what is required for sedentary work. Mr. Means also suffers from arthritis in his hands and wrists, making it extremely difficult to meet the sedentary standard, which the SSA describes as requiring "good use of the hands and fingers." Mr. Means' treating physicians, who have no financial stake in the outcome of his claim, are of the opinion that he is totally unable to work in any capacity, which is based on numerous physical examinations. The only information contained within Mr. Means' file that suggests he is capable of meeting the sedentary work standard was an "Employability Analysis Report" created by The Hartford, and a paper medical review conducted by a doctor paid by The Hartford who never even met Mr. Means. (*See* Exhibit "O", SSR 83-10).

38.  Mr. Means also does not have the training or experience to perform the jobs The Hartford has suggested. Mr. Means' LTD policy defines "any occupation" as one for which he is "qualified by education training or experience." Mr. Means has spent the last 37 years performing unskilled work. An individual does not gain skills that are transferrable to other occupations by performing unskilled work, and that is the only kind of work Mr. Means has ever performed. Mr. Means is not qualified for the jobs that The Hartford has suggested, which include working at a blood bank, an animal shelter, and for a maintenance service.

**B.      Defendant's Decision to Terminate Long Term Disability Benefits was not Supported by Substantial Evidence**

39.    In denying Mr. Means' long-term disability claim and appeal, the Hartford only analyzed two documents; an employability analysis that they themselves completed, and a paper medical review conducted by Dr. Molinda. Mr. Means' medical history as a whole clearly demonstrates that he met and continues to meet the plan's definition of disability. He has long suffered from debilitating pain due to widespread arthritis, as well as hypertension and blood clots. At no point does his medical record show that he was cured of any of these debilitating diseases. The only evidence that suggests he can continue to work was produced by or paid for by The Hartford.

40. The Hartford's decision to terminate Mr. Means' benefits was directly adverse to the opinions' of his treating physicians, opinions that were formed after numerous examinations, tests, and procedures. Even though they were required to treat Mr. Means as a beneficiary under the plan, The Hartford could not even be bothered to address in their final denial letter the statements made by Dr. Curtis and Dr. Salser requesting that Mr. Means continue to receive disability payments. Dr. Curtis wrote that Mr. Means' conditions "are chronic and lifelong in nature." Dr. Salser reiterated that point, and noted that the arthritis would remain and worsen. Both doctors stated that Mr. Means could not work. These opinions, formed after years of treatment, were arbitrarily dismissed in favor of a reviewer

whose knowledge of Mr. Means began and ended with a stack of paper. Remarkably, the appeal specialist who authored the denial found plenty of time to highlight the findings of Dr. Molinda, their paid paper reviewer, findings that conveniently justified denying Mr. Means the benefits rightly owed to him.

41.   In weighing the opinions of Mr. Means' providers against those of the independent reviewer retained by The Hartford, the Court should consider the following factors: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)).  The Court in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual."  While *Nord* provides that this Court is not required to adopt a per se rule to treat Mr. Means' physicians' opinions with more weight than those of Defendant's medical assessor, "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metropolitan Life Insurance Co.,* No. 1:04-CV-2376-BBM, 2005 U.S. Dist. LEXIS 22810, at *33 (N.D. Ga. Sept.

16, 2005);  *see also Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 795-96 (W.D. Mich. 2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits . . .").

42.   Paid experts are more often than not pre-disposed or preconditioned. Courts have consistently expressed their skepticism of such "experts" and held their reviews to be the very essence of arbitrariness and capriciousness. *Bennett v. Kemper HAT-Svcs, Inc.* 514 F. 3d 547, 554-55 (6th Cir. 2008); *Montour v. Hartford Life and Acc. Ins. Co.,* 588 F. 3d 623 (9th Cir. 2009); *Regula v. Delta Family Care Plan* 226 F.3d. 1130, 1143 (9th Cir. 2001).  The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting agreements.'" *Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).  The fact that their reports are consistently in conflict with the opinion of treating doctors' determinations should be viewed as evidence of a structurally conflicted process that results in bias.  Clearly, in Mr. Means' case, these decisions indicate that his treating physicians' evaluations should be afforded greater weight than the opinions of The Hartford's consultants.

**C.   Defendant's Failure to Properly Credit Mr. Means' Well Documented Complaints of Chronic Pain Was Arbitrary and Capricious.**

43.   Some of Mr. Means' primary disabling impairments have subjective

components; however, they have been diagnosed by his treating physicians based on his medical history, physical examinations, and observation. In their initial denial letter sent on December 19, 2016 and their appeal denial letter sent on February 13, 2017, The Hartford made no mention of how Mr. Means' chronic, well documented pain would affect his ability to perform work nor is there any evidence in the records that The Hartford even considered Mr. Means' pain in deciding whether or not to terminate his benefits. The Hartford also failed to give proper consideration to how Mr. Means' severe hypertension would restrict his ability to work. (*See* Exhibit "P", Hartford letters dated December 19, 2016 and February 13, 2017).

44.  In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224 (D. Conn. 2004), the Court held "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints." *Id* at 224.

45.  In *Creel v. Wachovia Corp.,* No. 08-10961, 2009 U.S. App. LEXIS 1733, 2009 WL 179584 (11th Cir. Jan. 27, 2009) and *Oliver v. Coca-Cola Co.,* 497 F.3d 1181, 1196-97 (11th Cir. 2007), vacated in part on other grounds, 506 F.3d 1316 (11th Cir. 2007), the United States Court of Appeals for the Eleventh Circuit considered when it was substantively reasonable to deny benefits for disabilities

involving subjective elements. In *Creel,* the plaintiff applied for disability benefits based on a diagnosis of depression, anxiety, and migraine headaches. She received long-term disability benefits, but the benefits were terminated after twenty-four months pursuant to a mental disorder limitation. She sued the insurance company to recover additional benefits based on her migraine headaches. She provided chart notes, standard diagnoses, and lab reports to support her claim, but the district court entered summary judgment against her because she did not provide objective evidence. The Court of Appeals vacated the summary judgment order, explaining:

> Our prior cases provide guidance for assessing the reasonableness of benefits denials for disabilities that involve some subjective element, such as migraines, fibromyalgia, and chronic pain syndrome. . . . When the plan has no [objective evidence requirement,] we evaluate the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions. Assuming that the claimant has put forward ample subjective evidence, we look at what efforts the administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent physician evaluations it conducted. Accordingly, and administrator's decision to deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review.

2009 U.S. App. LEXIS 1733, [WL] at *7.

46.  Applying this standard, the court found that the records offered by the plaintiff to corroborate her subjective complaints of disabling headaches were sufficient to support her claim and held that the administrator's decision was both

wrong and unreasonable. 2009 U.S. App. LEXIS 1733, [WL] at *8.  Similarly, in *Oliver*, the plaintiff sued his employer to recover long term disability benefits based upon radiculopathy and associated cervical pain, fibromyalgia, and chronic pain syndrome. The Court of Appeals held that it was arbitrary and capricious for an employer to deny benefits for disabilities involving elements of subjective pain when the claimant provided ample evidence and the administrator never requested any additional kind of evidence. *Oliver,* 497 F.3d at 1196-97.

47.   Here, Mr. Means provided evidence to support the claims of his numerous medical impairments. Mr. Means' medical records contain well-documented complaints of chronic pain and treatments stemming from his constant battle with Rheumatoid Arthritis, hip pain, wrist pain, neuropathy, and osteoarthritis in the knee. The records provided to The Hartford go as far back as 2014 where Dr. Salser noted Mr. Means' knee pain and arthritis. (*See* Exhibit "B"). The Hartford has not credited these well-documented complaints of chronic pain, or the opinions of Mr. Means' treating physicians who have noted multiple times that Mr. Means' condition continues to deteriorate. Instead, The Hartford has chosen to unreasonably terminate Mr. Means' valid claim.

### D.   The Hartford Failed to Properly Consider Mr. Means' Non-Exertional Limitations

48.  In *Demirovic v. Bldg. Serv. 32 B-J Pension Fund,* 467 F.3d 208, 213-14 (2d Cir. 2006)*,* the Court stated, "[A] reasonable interpretation of a claimant's

entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances." Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work . . . that actually exists in the national economy." *Id.* at 213-215.

49.   The Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. *See Rabuck v. Hartford Life and Accident Ins. Co.,* 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

50.   It has been documented multiple times in Mr. Means' medical records that he suffers from arthritis in his wrist and elbow, which invariably limits his manual dexterity. Dr. Salser has also noted on several occasions that prolonged sitting exasperates Mr. Means' arthritis pain. Mr. Means' conditions have steadily declined since 2014, and will continue to do so as his conditions are degenerative in nature.

## CAUSES OF ACTION
### Count One
### ERISA (Claim for Benefits Owed under Plan)

51.   Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

59.   At all times relevant to this action, Mr. Means was a participant of the Long Term Disability Policy No. GLT395120 ("the Plan") within the meaning of 29 U.S.C. § 1002(7), and was eligible to receive disability benefits under the Plan.

60.   As more fully described above, the termination and refusal to pay Mr. Means benefits under the plan on or about January 11, 2017 through the present constitutes a breach of Defendant's obligations under the plan and ERISA. The decision to terminate benefits to Mr. Means was not reasonable and it was not based on substantial evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1.   The applicable standard of review in this case is *de novo*.

2.   That the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate *de novo* review;

3.   From at least August 2014 through the present, Mr. Means met the Plan's definition of disabled;

4.     Defendant shall pay Mr. Means all benefits due for the period from at least January 11, 2017 through the present in accordance with the policy;

5.     Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

6.     Defendant shall pay Plaintiff's costs of litigation and any and all other reasonable costs and damages permitted by law;

7.     Defendant shall pay attorney's fees for Plaintiff's counsel;

8.     Plaintiff shall receive such further relief against Defendant as the Court deems lawful, just and proper.

Respectfully Submitted,


*/s/ Peter H. Burke*_____
Peter H. Burke (ASB-1992-K74P)

*/s/ Jessica Ann Hayslip*
Jessica Ann Hayslip
(ASB-2464-E98L)

**OF COUNSEL**:

BURKE HARVEY, LLC
3535 Grandview Parkway, Suite 100
Birmingham, Alabama 35243
Phone:    205-930-9091
Fax:     205-930-9054
pburke@burkeharvey.com
jhayslip@burkeharvey.com

*Attorneys for Plaintiff Charles Means*

**<u>PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT:</u>**

Hartford Life and Accident Insurance Company
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL  36104